IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Donald E. Cranfill,<br><br>      Plaintiff,<br><br>  vs.<br><br>SC Home Builders Self Insurers Fund; Weston Griffeth, individually and in his capacity as Administrator; Richard Balmer, individually and in his capacity as Manager; Herb Witter, Colin Campbell, Eddie Weaver, Jim Gregorie, Keith Smith, and Tom Markovich, individually and in their capacities as Trustees/Board Members of the SC Home Builders Self Insurers Fund; Greenville County Sheriff's Office; and Hobart Lewis, Seth Thomas Mills, Jonathan Dale Holloway, and William Doyle Brewer, individually and in their capacities on behalf of Greenville County Sheriff's Office,<br><br>      Defendants. | C.A. No. 6:22-cv-2677-JDA-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

  This matter is before the court on the motion for summary judgment filed by the defendants Greenville County Sheriff's Office ("GCSO") and Hobart Lewis, Seth Thomas Mills, Jonathan Dale Holloway, and William Doyle Brewer, individually and in their capacities on behalf of the GCSO (collectively, "the GCSO defendants") (doc. 67). Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d)(D.S.C.), this magistrate judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. § 1983 and submit findings and recommendations to the district court.

## I. BACKGROUND

The action against the GCSO defendants, as well as defendants SC Home Builders Self Insurers Fund ("the Fund"); Weston Griffeth, individually and in his capacity as Administrator; Richard Balmer, individually and in his capacity as Manager; and Herb Witter, Colin Campbell, Eddie Weaver, Jim Gregorie, Keith Smith, and Tom Markovich, individually and in their capacities as Trustees/Board Members of the Fund (collectively, "the Fund defendants") arises from events occurring on Friday, June 18, 2021, when the GCSO was contacted by representatives of the Fund, which is the plaintiff's former employer, to seek assistance in recovering a company-owned vehicle from the plaintiff (doc. 1-1 at ¶ 40). The plaintiff, Donald E. Cranfill, filed a complaint in the Greenville County Court of Common Pleas on June 16, 2022, against the Fund defendants and the GCSO defendants (*id.*). The Fund defendants removed the case to this court on August 12, 2022 (doc. 1). The complaint alleges causes of action against the GCSO defendants pursuant to Section 1983 for violation of the plaintiff's rights under the Fourth and Fourteenth Amendments, as well as state law claims for trespass, false arrest, and abuse of process[1] (doc. 1-1 at pp. 27-30).

The GCSO defendants and Fund defendants filed motions for summary judgment on September 5, 2024 (docs. 67, 68). After receiving two extensions of time to respond, the plaintiff instead filed a motion to remand on October 15, 2024, based upon the GCSO defendants' Eleventh Amendment immunity defense (doc. 80). In response, the GCSO defendants withdrew and waived their Eleventh Amendment immunity defense (doc. 97 at p. 3).[2] The plaintiff filed a response to the Fund defendants' motion for summary judgment (doc. 90), but he did not file a response to the GCSO defendants' motion for

---

[1] While the GCSO defendants argue that the plaintiff may have brought a civil conspiracy action against them (doc. 67-1 at pp. 13–15), the plaintiff was clear in the complaint that this cause of action was alleged only against the Fund defendants (doc. 1-1 at ¶¶ 99–102).

[2] By separate report and recommendation, the undersigned recommends that the plaintiff's motion to remand be denied (doc. 98).

summary judgment. The plaintiff has had more than sufficient time to respond, and accordingly, the GCSO defendants' motion for summary judgment is ripe for review.

## II. FACTS PRESENTED

The plaintiff was previously employed by the Fund as a safety consultant (doc. 68-3 at p. 3, Cranfill dep. 66:1–4). On June 18, 2021, at 3:08 p.m., the Fund's administrator, Weston Griffeth, emailed the plaintiff to notify him that the Fund had terminated his employment (doc. 68-3 at p. 76). The termination email also stated that the plaintiff "may make arrangements with Richard Balmer, the plaintiff's former supervisor, for return of [his] company vehicle and all other company property" (*id.*). About an hour later, Balmer sent a text message to the plaintiff telling the plaintiff that Balmer and Griffeth were headed to the plaintiff's house to retrieve the Fund's "vehicle, phone, surface, photo ID, and any other company items" (*id.* at p. 77). The plaintiff responded that he already had plans and instructed Balmer "DO NOT COME ON MY PROPERTY FOR ANY REASON WITHOUT A COURT ORDER and/or SEARCH WARRANT" because the plaintiff believed that he was "entitled to a reasonable time to secure [his] belongings and records" (*id.*). He repeated to Balmer by text message, "DO NOT COME ON THIS PROPERTY" and said that he would "be more than happy to release any property of [the Fund] when reasonable notice has been given" and he had "time to check and secure [his] personal items and records [he] need[s] in the defense of the allegations made against [him]" (*id.*). The plaintiff did not mention any other persons or entities in this text message (*see id.*).

At this time, the plaintiff possessed a vehicle issued to him by the Fund, and he normally stored personal property and documents in this vehicle (doc. 90-3 at p. 6, ¶ 29). He stated that he parked this vehicle the same way that he normally would on a Friday, with his personal van parked very close behind it (*id.*; doc. 68-3 at pp. 78, 82, 83). This vehicle was titled in the Fund's name, and Griffeth claims that it was "the most valuable asset that the Fund had at the time, the newest car we had that had our logo on it" (doc. 68-6 at p. 28–29, Griffeth dep. 138:22–139:3).

Later that day, Griffeth contacted the GCSO about recovering the vehicle, and his call was routed to the GCSO uniform patrol shift supervisor, defendant Sergeant William Doyle Brewer (*id.* at 138:2–3; doc. 90-5 at pp. 5–6, Brewer dep. at 17:23–18:3). Griffeth said he contacted the GCSO to help with "facilitating" and "de-escalating" the situation with the plaintiff and the vehicle (doc. 68-6 at p. 29–30, Griffeth dep. at 139:5–9; 140:6–9). Sgt. Brewer instructed defendant Deputies Jonathan Dale Holloway and Seth Thomas Mills to assist representatives of the Fund to retrieve the Fund's vehicle in the plaintiff's possession (doc. 67-2 at p. 1, ¶ 2; doc. 67-3 at p. 1, ¶ 2). They met with Griffeth and Balmer for the first time in a church parking lot to obtain additional information from them before going to the plaintiff's house (doc. 67-2 at p. 2, ¶ 3; doc. 67-3 at p. 2, ¶ 3; doc. 68-6 at p. 29, Griffeth dep. at 139:10–14). Deputies Holloway and Mills were present to peacefully facilitate possession of the Fund's vehicle from the plaintiff back to the Fund (doc. 67-2 at p. 2, ¶ 6; doc. 67-3 at p. 2, ¶ 5). During the encounter at the church and the encounters at plaintiff's home, Deputies Holloway and Mills wore activated body-worn cameras (docs. 90-9, 90-11, 90-12, 68-11, 67-4).

At the church, there were conversations among Deputy Holloway, Deputy Mills, and Griffeth with Deputy Holloway saying the plaintiff "might get a 10-81"[3] (doc. 90-9 at 5:55). Griffeth also showed Deputy Mills the earlier text message from the plaintiff that demanded Balmer obtain a court order and/or search warrant before entering the plaintiff's property (doc. 90-12 at 2:45). After reviewing the message, Deputy Mills said the plaintiff "sounds like a real piece of work" and concluded that the Fund owned the vehicle in question (*id.* at 4:05, 5:55).

After arriving at the plaintiff's house, Deputy Holloway first approached the front door, but he walked over to the driveway when he saw the plaintiff and Lori Evans arrive in their vehicle (doc. 68-11 at 0:25). Upon their arrival, the plaintiff asked if the deputies were there for their dog that had escaped from the backyard, and Deputy Holloway

---

[3] A code "10-81" is a disturbance or fight (doc. 90-27 at p. 2).

told him that they were there for the vehicle (*id.* at 0:55). After being told the reason for their presence, the plaintiff shook Deputy Holloway's hand and introduced himself (*id.* at 1:01). Deputy Holloway told the plaintiff that they were there to prevent a breach of trust criminal situation to which the plaintiff responded, "I appreciate that" (*id.* at 2:54). The plaintiff confirmed that he did not own or rent the vehicle and only used it in the course of his prior employment with the Fund (*id.* at 3:54). Eventually, the plaintiff said that he "was not trying to be argumentative," and he would "move the vehicles" as soon as Evans came back with their dogs (*id.* at 5:46). During their interactions, the plaintiff repeatedly asked the deputies questions and proceeded to interject while the deputies were attempting to answer those questions (*see, e.g., id.* at 2:28, 2:50, 9:52). The plaintiff also issued several requests and demands to the deputies (*see, e.g.*, *id.* at 2:06 (asking Deputy Mills to stop talking while the plaintiff waited to see if the dog was found), 18:51 (demanding Deputy Holloway read a text message), 24:05 (commanding Deputy Holloway to look at the plaintiff)), but he never once asked them to leave his property (doc. 68-3 at p. 37, Cranfill dep. at 267:22–25). In fact, the plaintiff appeared agitated when Deputy Holloway did eventually leave the property and challenged Deputy Holloway's suggestion that the plaintiff no longer wanted the deputies on his property (doc. 68-11 at 26:46).

After the plaintiff continued to argue with the deputies, Deputy Mills said, "Let me put it in short. You do all this stuff with your lawyer, not with us. Give the car back. Go get your stuff out of it" (doc. 90-11 at 9:45). The plaintiff eventually asked the deputies if they wanted to take him to jail to which Deputy Holloway responded, "There is nothing in the closest to that we want" (doc. 68-11 at 10:05). Deputy Mills asked the plaintiff, "Why are you prolonging this?" to which the plaintiff responded, "Because two policeman have come onto my yard not being told the truth of what's going on" (doc. 90-11 at 10:09). Deputy Mills told the plaintiff that Deputies Holloway and Mills "can leave, and [the plaintiff] can get charged with breach of trust. That's fine. We're just trying to save you from that" (*id.* at 10:19). Deputy Mills continued, "There's plenty of probable cause to say that you

5

could be charged with a breach of trust" (*id.* at 10:51).[4]  Evans asked for a "few minutes" to retrieve their personal items from the vehicle, and Deputy Holloway said, "By all means, yeah, yeah" and "that's what we're hoping for" (doc. 68-11 at 11:38).  Evans then said to Deputy Mills, "Thank you for all you do" (doc. 90-11 at 12:50).

Deputy Holloway encouraged the plaintiff to take as many pictures and videos of the vehicle as the plaintiff needed, and he again told the plaintiff that there were was no criminal complaint and he was there to "prevent a criminal complaint" (doc. 68-11 at 14:55).  Deputy Holloway also confirmed with the plaintiff that the plaintiff removed all of his personal items from the vehicle (*id.* at 17:08).

Eventually, the plaintiff told Deputy Holloway, "We've been ready to return [the vehicle]," and when asked if he wanted to remove the vehicle from his property himself, he gave Griffeth express permission to drive the vehicle off his property (doc. 68-11 at 21:59, 22:27).  Griffeth only entered the plaintiff's property after the deputy told him it was safe to recover the vehicle (doc. 68-6 at p. 43, Griffeth dep. at 168:15–18).  Neither Griffeth nor Balmer entered the plaintiff's property before the deputies arrived, and they testified that they had nothing to do with the plaintiff's dog escaping (doc. 68-6 at p. 42, Griffeth dep. at 169:3–14).

Later that evening, the plaintiff called the GCSO and requested that Deputy Holloway return to their property to investigate how their dog escaped (*see* doc. 67-4, Holloway—BWC (Plaintiff's residence re dog)).  When the plaintiff tried to have further discussions about the Fund's vehicle, Deputy Holloway told the plaintiff and Evans that he was only there for the dog and would not be discussing the vehicle any further (*id.* at 2:07, 2:24).  Deputy Holloway was present at the property for almost twice as long as he was for

---

[4] The plaintiff completed law school, passed the South Carolina bar exam, and referred to himself as a lawyer in his conversations with the deputies (doc. 90-11 at 11:13; S.C. Judicial Branch—Attorney Search, https://www.sccourts.org/attorneys/ (enter Donald Eugene Cranfill) (shows inactive status) (last visited Jan. 21, 2025). *See Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that courts "may properly take judicial notice of matters of public record").

the first visit, and the plaintiff asked him to look in several places on his property as part of his investigation (*see generally id.*). Before Deputy Holloway left the property, the plaintiff told him they "appreciate [Deputy Holloway] coming out" (*id.* at 54:54).

### III. APPLICABLE LAW AND ANALYSIS

*A. Summary Judgment Standard*

Federal Rule of Civil Procedure 56 states as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

*B. Section 1983*

The GCSO defendants seek summary judgment on the plaintiff's Section 1983 claim because the plaintiff has not stated a sufficient constitutional deprivation (doc. 67-1 at 4). Because the plaintiff sued all of the GCSO defendants "in their capacities on behalf of" the GCSO (doc. 1-1 at pp. 1, 5, 6), the GCSO defendants also argue that the claims against them should be dismissed because they are not "persons" under Section 1983 (doc. 67-1 at 8). While the plaintiff did not respond to this motion, in his response to the Fund defendants' motion, the plaintiff claims that the GCSO defendants and the Fund defendants worked together to violate his Fourth Amendment rights by entering his property and seizing the vehicle and to violate his Fourteenth Amendment rights by falsely imprisoning him without due process (doc. 90 at 35–37).

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "The Fourth Amendment protects homes and the 'land immediately surrounding and associated' with homes, known as curtilage, from unreasonable government intrusions." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 192 (4th Cir. 2015) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Moreover, "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and citations omitted). One such exception is "the so-called knock-and-talk exception to the Fourth Amendment's warrant requirement," under which "'a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Covey*, 777 F.3d at 192 (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). In the typical situation, an officer has an "'implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Id.* When circumstances reasonably indicate that the officer might find the homeowner

elsewhere on the property, an officer may bypass the front door or another entry point typically used by visitors. *Id.* (citing *Pena v. Porter*, 316 F. App'x 303, 313 (4th Cir. 2009)).

Here, summary judgment should be granted in favor of the GCSO defendants on the plaintiff's claim that they violated his Fourth Amendment rights.  The plaintiff claims that he had a legal right to possession of the Fund's vehicle under a bailment theory and had no legal obligation to return the vehicle when the GCSO deputies came to his home on June 18, 2021 (doc. 90 at 33–34).  Even accepting as true the plaintiff's argument that his possession of the vehicle was a bailment and that he had no legal obligation to return the vehicle that day, the plaintiff voluntarily relinquished all possessory interest in the vehicle (doc. 68-11 at 5:46, 21:59, 22:27).  None of the defendants compelled him to return the vehicle or seized the vehicle before the plaintiff gave express permission for them to do so. While the plaintiff argues in response to the Fund defendant's motion for summary (doc. 90 at 34) that Deputy Mills compelled him to return the vehicle (*see* doc. 90-11 at 9:45), Deputy Mills stated in the same conversation mere seconds later that the GCSO deputies could leave the property and come back later if the Fund defendants filed a criminal complaint against the plaintiff (*see* doc. 90-11 at 10:19).

Also, Deputies Mills and Holloway had an implicit license to enter the plaintiff's property and approach the front door until they saw the plaintiff in his driveway and pivoted to meet the plaintiff there (doc. 68-11 at 0:25).  The plaintiff, who is legally trained and refers to himself as a lawyer, never told anyone from the GCSO that they were not permitted on his property, and he never asked either Deputy Mills or Deputy Holloway to leave his property.  To the contrary, later on the same day, the plaintiff requested that Deputy Holloway return to the property, and upon his return, the plaintiff attempted to further discuss the vehicle issue (*see* doc. 67-4, Holloway—BWC (Plaintiff's residence re dog) at 2:07, 2:24).  While the plaintiff claims that a text message he had sent to Balmer earlier in the day was a "clear constitutional warning" that applied to the GCSO deputies (doc. 90 at 36), a reading of the text message shows that the warning specifically applied to Balmer (and possibly the other Fund defendants) (*see* doc. 68-3 at p. 77).  There is no

command to the GCSO or anyone other than the actual recipient of the message. This "warning" cannot reasonably apply to parties to whom it was not addressed. Accordingly, the plaintiff has failed to present sufficient evidence to support his Section 1983 Fourth Amendment claim.

Although the plaintiff alleges a Fourteenth Amendment violation for false imprisonment (doc. 90 at 36), Section 1983 actions premised on malicious prosecution, false arrest, and/or false imprisonment are analyzed as actions claiming unreasonable seizures in violation of the Fourth Amendment. *See, e.g.*, *Brown v. Gilmore*, 278 F.3d 362, 367–68 (4th Cir. 2002) (recognizing that a plaintiff alleging a Section 1983 false arrest claim needs to show that the officer decided to arrest him without probable cause to establish an unreasonable seizure under the Fourth Amendment); *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (stating claims of false arrest and false imprisonment "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment").

The plaintiff has presented no evidence that any of the GCSO defendants seized him in violation of the Fourth Amendment. In his response to the Fund defendants' motion for summary judgment, the plaintiff provides no citations to any record evidence showing an arrest and baldly concludes in his response to the Fund defendants' motion for summary judgment that "the words and conduct of the GCSO were such to intentionally induce a reasonable apprehension of force; accordingly, and [sic] the means of coercion were at hand" (doc. 90 at 37). To the contrary, the unrebutted evidence presented to the court shows that Deputies Mills and Holloway had no intention of arresting the plaintiff and expressed that to the plaintiff multiple times (*see* doc. 68-11 at 2:54, 10:05, 21:30, 22:31). Moreover, at no point did the deputies restrain the plaintiff or even attempt to restrict his movements in any manner. Thus, there was no "seizure of the person in violation of the Fourth Amendment," and summary judgment should be granted on the plaintiff's Section 1983 claims for alleged Fourth and Fourteenth Amendment violations.

Finally, county sheriff's offices in South Carolina are considered alter egos or arms of the state. *Ramirez v. Anderson Cnty. Sheriff's Off.*, No. 1:14-cv-3217-TMC-SVH,

2016 WL 4394505, at *2 (D.S.C. July 25, 2016), *R&R adopted* No. 1:14-cv-3217-TMC, 2016 WL 4266130 (D.S.C. Aug. 12, 2016) (citing *Gulledge v. Smart*, 691 F.Supp. 947, 954–55 (D.S.C. 1988), *aff'd*, 878 F.2d 379 (4th Cir. 1989); *Carroll v. Greenville Cnty. Sheriff's Dep't*, 871 F.Supp. 844, 846 (D.S.C. 1994); S.C. Code Ann. § 23-13-550). Because the GCSO and its employees in their official capacities were acting as arms of the State of South Carolina at all times relevant to the plaintiff's allegations, they are not considered "persons" within the meaning of Section 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983"). Accordingly, they cannot be sued in their official capacities, and the GCSO defendants are entitled to summary judgment on the plaintiff's Section 1983 claims.

***C. Trespass***

The plaintiff also brings a trespass claim against Sgt. Brewer, Deputy Holloway, and Deputy Mills under South Carolina state law[5] (doc. 1-1 at pp. 28–29), and these defendants argue that they did not trespass because they had an implied license to enter the property (doc. 67-1 at 10–11). The plaintiff did not respond to this argument. "Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *Hedgepath v. Am. Tel. & Tel. Co.*, 559 S.E.2d 327, 337 (S.C. Ct. App. 2001). "To state a claim for trespass, a plaintiff must allege facts showing three elements — that the defendant took 'an affirmative act,' that 'the invasion of the land [was] intentional,' and that 'the harm caused [was] the direct result of that invasion.'" *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 538 (D.S.C. 2024) (quoting *Snow v. City of Columbia*, 409 S.E.2d 797, 802 (S.C. Ct. App. 1991)). South Carolina recognizes the "knock and talk" exception to permit officers to approach a home to speak with the

---

[5] This court may exercise supplemental jurisdiction to decide the plaintiff's state law claims under 28 U.S.C. § 1367(a) because the plaintiff's "state and federal claims . . . derive from a common nucleus of operative fact.'" *See Funderburk v. S.C. Elec. & Gas Co.*, 406 F. Supp. 3d 527, 533–34 (D.S.C. 2019) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)), *aff'd sub nom. Funderburk v. CSX Transp., Inc.*, 834 F. App'x 807 (4th Cir. 2021).

11

inhabitants. *See State v. Bash*, 419 S.C. 263, 273, 797 S.E.2d 721, 726 (2017) ("A knock and talk 'occurs when a law enforcement officer . . . approaches a residence by a route available to the general public, knocks on the front door of the residence, and speaks with an occupant of the residence who responds to the knocking.'" (quoting 68 Am. Jur. 2d Searches and Seizures § 21 (2010)).

Here, the plaintiff's claim for trespass fails because neither Sgt. Brewer, Deputy Holloway, nor Deputy Mills "invaded" the plaintiff's property. First, no evidence has been presented that Sgt. Brewer was ever present on the plaintiff's property. Second, Deputies Holloway and Mills were authorized to enter the plaintiff's property by approaching the front door to speak with the plaintiff but quickly, and lawfully, pivoted to the driveway when they saw the plaintiff approach (doc. 68-11 at 0:25). At no time did the plaintiff ever ask them to leave and, later that same day, the plaintiff requested that Deputy Holloway return to the property (*see* doc. 67-4, Holloway—BWC (Plaintiff's residence re dog) at 2:07, 2:24). The plaintiff has presented no evidence disputing these facts. Accordingly, the plaintiff's state law trespass claim should be dismissed.

### *D. False Arrest*

The plaintiff also brings a state law claim for "false arrest" against Sgt. Brewer, Deputy Holloway, and Deputy Mills (doc. 1-1 at p. 29). These defendants argue that they never arrested the plaintiff because they never restrained the plaintiff or attempted to restrict his movements (doc. 67-1 at 11). The plaintiff did not respond to this argument. In South Carolina, false arrest is also known as false imprisonment. *Carter v. Bryant*, 838 S.E.2d 523, 527 (S.C. Ct. App. 2020). To establish a claim for false imprisonment, "the evidence must demonstrate (1) the defendant restrained the plaintiff, (2) the restraint was intentional, and (3) the restraint was unlawful." *Caldwell v. K-Mart Corp.*, 410 S.E.2d 21, 23 (S.C. Ct. App. 1991) (citing *Andrews v. Piedmont Air Lines*, 377 S.E.2d 127 (S.C. Ct. App.1989)). Here,  none of the GCSO defendants restrained or attempted to restrict the

plaintiff's movements.[6] The evidence presented in the supplied body camera footage establishes that the plaintiff had free movement throughout the encounter with the deputies (*see* generally docs. 68-11, 90-11), and the plaintiff has supplied no other evidence to contradict this.  Deputy Holloway told the plaintiff multiple times that they were there on a civil matter and had no intention or desire to arrest the plaintiff (*see, e.g.*, doc. 68-11 at 2:54, 10:05, 21:30, 22:31).   Therefore, the undersigned recommends that summary judgment be granted in favor of Sgt. Brewer, Deputy Holloway, and Deputy Mills on the plaintiff's state law claim for false arrest.

### *E. Abuse of Process*

Sgt. Brewer, Deputy Holloway, and Deputy Mills argue that summary judgment should be granted on the plaintiff's state law abuse of process claim because there is no evidence of any "ulterior purpose" or "willful acts" (doc. 68-1 at 20–21).  The plaintiff did not respond to this argument but does argue in response to the Fund defendants' motion for summary judgment that the GCSO "compel[led] Plaintiff to turn over the car" (doc. 90 at 26).

"'The essential elements of an abuse of process claim are an ulterior purpose and a willful act in the use of the process not proper in the conduct of the proceeding.'" *Argoe v. Three Rivers Behavioral Ctr. & Psychiatric Solutions*, 697 S.E.2d 551, 556 (S.C. 2010) (quoting *Hainer v. Am. Med. Int'l, Inc.*, 492 S.E.2d 103, 107 (S.C. 1997)).  "The abuse of process tort provides a remedy for one damaged by another's perversion of a legal procedure for a purpose not intended by the procedure."  *Id.* (citing *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 567 S.E.2d 251, 253 (S.C. Ct. App. 2002)).  "Some definite act or threat not authorized by the process or aimed at an object not legitimate in the use of the process is required."  *Hainer*, 492 S.E.2d at 107.  However, a defendant will not be held liable for an abuse of process where it has "done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."  *Id.*  The

---

[6] Again, no evidence has been presented that Sgt. Brewer was ever present on the plaintiff's property.

essence of the tort of abuse of process centers on events occurring outside the process, namely:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Swicegood v. Lott*, 665 S.E.2d 211, 214 (S.C. Ct. App. 2008) (quoting *Huggins v. Winn–Dixie Greenville, Inc.*, 153 S.E.2d 693, 694 (S.C. 1967)).

Here, even assuming that what happened was "process," the record contains no such coercion, collateral advantage, or extortion. Deputy Holloway told the plaintiff that they were present to keep the peace and to avoid the Fund filing a criminal complaint against the plaintiff but reiterated they had no intention of arresting him presently (doc. 68-11 at 2:54, 10:05, 21:30, 22:31). Contrary to the plaintiff's argument, the GCSO did not "compel" the plaintiff to return the vehicle. At the outset, the plaintiff willingly told the deputies that he would move the vehicles once Evans returned with his loose dog (*id.* at 5:46). Later, Deputy Mills told the plaintiff that the deputies could leave but warned the plaintiff that they could return if the Fund defendants pursued a breach of trust complaint (doc. 90-11 at 10:19). The GCSO deputies acting as peacekeepers to facilitate a transfer of the vehicle from the plaintiff to the Fund to avoid the criminal process was not "a perversion of the civil process." The plaintiff provides no evidence that any of the GCSO defendants acted with bad intentions or motive. Thus, the plaintiff's state law abuse of process claim should be dismissed.

### F. Emotional and Punitive Damages

In all three of the plaintiff's state law claims, he alleges that he suffered "damages, including, but not limited to, extreme embarrassment, extreme stress and severe and extreme emotional distress," as well as punitive damages from these "intentionally" committed torts (doc. 1-1 at ¶¶ 121, 122, 123, 125, 128, 129, 131, 133, 134). Sgt. Brewer, Deputy Holloway, and Deputy Mills argue that these damages are barred by the South

Carolina Tort Claims Act ("SCTCA"), S.C. Code § 15-78-10, *et seq.* (doc. 67-1 at 13). The plaintiff did not respond to this argument.

The SCTCA "governs all tort claims against governmental entities and is the exclusive civil remedy available in an action against a governmental entity or its employees." *Flateau v. Harrelson*, 584 S.E.2d 413, 416 (S.C. Ct. App. 2003); *see* S.C. Code § 15-78-20(b). All government entities, defined as the "State, its political subdivisions, and employees," may be held liable for their torts as a private individual would be liable, subject to the limitations and exemptions of the SCTCA. *Id.*; *Hawkins v. City of Greenville*, 594 S.E.2d 557, 563 (S.C. Ct. App. 2004) (citing S.C. Code Ann. §§ 15-78-30(d), 15-78-40)). The SCTCA "is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C. Code Ann. § 15-78-200. "For a government employee to be acting within the scope of his official duty or employment, the employee must be (1) 'acting in and about the official business of the government entity,' and (2) 'performing official duties.'" *Wade v. Berkeley Cnty.*, 498 S.E.2d 684, 688 (S.C. 1998) (quoting S.C. Code § 15–78–30(i)). Any person who suffers a loss caused by the tort of a political subdivision or its employee may file a claim, but "[l]oss" under the SCTCA "does not include the intentional infliction of emotional harm." S.C. Code §§ 15-78-50(a), 15-78-30(f). Further, "[n]o award for damages under [SCTCA] shall include punitive or exemplary damages . . . ." S.C. Code § 15-78-120(b).

Here, Sgt. Brewer, Deputy Holloway, and Deputy Mills were acting in their capacities as employees of the GCSO, an arm of the State of South Carolina as discussed *supra* Part III(B). Thus, all of the plaintiff's state law claims are subject to the limitations under the SCTCA. Because the only damages that the plaintiff alleges under these "intentionally" committed state law claims are the infliction of emotional distress and punitive damages, these claims are further barred by the SCTCA.

*G. Qualified Immunity*

Sgt. Brewer, Deputy Holloway, and Deputy Mills further argue that they are entitled to qualified immunity because the plaintiff has failed to show they violated the plaintiff's constitutional rights (doc. 67-1 at 5-7). The plaintiff did not respond to this argument.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). When a qualified immunity defense is raised, the courts apply a two-part test. First, the court must determine whether the facts viewed in the plaintiff's favor make out a violation of one's constitutional rights, and second, whether the violated right was clearly established at that time. *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 233, 231 (2009)). The Court of Appeals for the Fourth Circuit employs a split burden of proof for the qualified immunity defense. The plaintiff bears the burden of proving the first prong, and the [officer] bears the burden on the second prong. *Id.* at 233 (citing *Henry v. Purnell*, 501 F.3d 374, 377-78 & n.4 (4th Cir. 2007)). Here, as discussed *supra* Part III(B), the plaintiff has failed to demonstrate that the defendants violated his constitutional rights. Therefore, these defendants are entitled to qualified immunity.

*H. Respondeat Superior*

Sheriff Hobart Lewis argues that he cannot be held liable under a theory of supervisory liability for the conduct of his subordinates (doc. 67-1 at 7–8). The plaintiff did not respond to this argument. In the complaint, the plaintiff attempts to make a respondeat superior claim against Sheriff Lewis in the context of other GCSO defendants acting "at the direction of Sheriff Lewis" for his Section 1983 and trespass claims (doc. 1-1 at ¶¶ 116, 121).

"Each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (rejecting an argument that government officials can be held liable because they merely had knowledge

of or acquiesced in a subordinate's misconduct). As the plaintiff has failed to show that any of the GCSO defendants violated his constitutional rights or trespassed, the claim against Sheriff Lewis as their supervising officer should likewise be dismissed. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) ("Section 1983 will not support a claim based on a *respondeat superior* theory of liability.") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury).

## IV. CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the district court grant the GCSO defendants' motion for summary judgment (doc. 67)

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 24, 2024
Greenville, South Carolina

***The attention of the parties is directed to the important notice on the next page.***

***Notice of Right to File Objections to Report and Recommendation***

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 250 East North Street, Suite 2300
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).