IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Donald E. Cranfill,         ) | C.A. No. 6:22-cv-2677-JDA-KFM |
|            Plaintiff,  ) | |
|        ) | **REPORT OF MAGISTRATE JUDGE** |
|    vs.        ) | |
|        ) | |
| SC Home Builders Self Insurers Fund;  ) | |
| Weston Griffeth, individually and in his  ) | |
| capacity as Administrator; Richard  ) | |
| Balmer, individually and in his capacity  ) | |
| as Manager; Herb Witter, Colin  ) | |
| Campbell, Eddie Weaver, Jim Gregorie,  ) | |
| Keith Smith, and Tom Markovich,  ) | |
| individually and in their capacities as  ) | |
| Trustees/Board Members of the SC  ) | |
| Home Builders Self Insurers Fund;  ) | |
| Greenville County Sheriff's Office; and  ) | |
| Hobart Lewis, Seth Thomas Mills,  ) | |
| Jonathan Dale Holloway, and  ) | |
| William Doyle Brewer, individually and  ) | |
| in their capacities on behalf of  ) | |
| Greenville County Sheriff's Office,  ) | |
|        ) | |
|          Defendants.  ) | |

This matter is before the court on the motion for summary judgment filed by the defendants SC Home Builders Self Insurers Fund ("the Fund"); Weston Griffeth, individually and in his capacity as Administrator; Richard Balmer, individually and in his capacity as Manager; and Herb Witter, Colin Campbell, Eddie Weaver, Jim Gregorie, Keith Smith, and Tom Markovich, individually and in their capacities as Trustees/Board Members of the SC Home Builders Self Insurers Fund (collectively, "the Fund defendants") (doc. 68). Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(d)(D.S.C.), this magistrate judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. § 1983 and submit findings and recommendations to the district court.

# I. BACKGROUND

The action against the Fund defendants, as well as defendants Greenville County Sheriff's Office ("GCSO") and Hobart Lewis, Seth Thomas Mills, Jonathan Dale Holloway, and William Doyle Brewer, individually and in their capacities on behalf of the GCSO (collectively, "the GCSO defendants"), arises from events occurring on Friday, June 18, 2021, when the GCSO was contacted by representatives of the Fund, which is the plaintiff's former employer, to seek assistance in recovering a company-owned vehicle from the plaintiff (doc. 1-1 at ¶ 40).  The plaintiff filed a complaint in the Greenville County Court of Common Pleas on June 16, 2022, against the Fund defendants and the GCSO defendants (*id.*).  The Fund defendants removed the case to this court on August 12, 2022 (doc. 1).  The complaint alleges causes of action against the Fund defendants for violations of Occupational Safety and Health Administration ("OSHA") laws, wrongful termination, fraudulent misrepresentation, defamation, intentional infliction of emotional distress ("IIED"), abuse of process, trespass, wage violations under the Fair Labor Standards Act ("FLSA"), civil conspiracy, constitutional violations, and breach of contract (doc. 1-1 at pp. 14–27).

The GCSO defendants and Fund defendants filed motions for summary judgment on September 5, 2024 (docs. 67, 68).  After receiving two extensions of time to respond, the plaintiff instead filed a motion to remand the case against the GCSO defendants to state court on October 15, 2024, based upon the GCSO defendants' Eleventh Amendment immunity defense (doc. 80).  In response, the GCSO defendants withdrew their Eleventh Amendment immunity defense (doc. 97 at p. 3).  The plaintiff did not file a response to the GCSO defendants' motion for summary judgment.[1]

On October 15, 2024, the plaintiff filed a 62-page response to the Fund defendants' motion for summary judgment (doc. 78), but the Clerk of Court sent the plaintiff's counsel a deficiency notice alerting him that he must request permission to file excess pages (*see* doc. 87).  On October 23, 2024, the plaintiff filed a motion for leave to

---

[1] By separate report and recommendation, the undersigned recommends that the GCSO defendants' motion for summary judgment be granted.

file excess pages and a "corrected" response in opposition to the motion for summary judgment that was 62 pages in length (doc. 86). The court granted the plaintiff's motion for leave to file excess pages, allowing the plaintiff to file a response up to 45 pages in length, and directed the Clerk of Court to remove the plaintiff's two previously filed responses (docs. 78, 86) from the docket (doc. 87). The court ordered the plaintiff to file his response to the Fund defendants' motion for summary judgment by November 1, 2024 (*id.*). On November 1, 2024, the plaintiff filed a 39-page response to the Fund defendants' motion for summary judgment (doc. 90). The Fund defendants filed a reply on November 8, 2024 (doc. 95). Accordingly, this motion for summary judgment is ripe for review.

## II. FACTS PRESENTED

The Fund provides workers' compensation insurance to self-insured employers of various sizes and in various trades within the residential construction industry in South Carolina (doc. 68-6 at p. 33, Griffeth dep. at 159:14–23). The Fund's administrator, defendant Weston Griffeth, oversees the operations and directly supervises the department managers, and he reports to the Fund's Board of Directors (*id.* at p. 3, 8:14–18). The Fund hired the plaintiff as a safety consultant in November 2017, and his employment was at-will and was initially self-classified as "non-exempt" (doc. 68-3 at p. 45). He was provided an employee handbook that contained a disclaimer stating, in underlined capital letters on the first page, that the handbook was not a contract of employment, and the plaintiff signed and dated this disclaimer on November 13, 2017 (*id.* at p. 47).

As a safety consultant, the plaintiff had many duties in his job description including conducting risk control surveys at members' jobsites, identifying hazards and proposing corrective actions, preparing verbal and written reports for use by members and the Fund's management team, assisting in underwriting inspections to determine a candidate's suitability for participation in the Fund, assisting in post-accident investigations, seeking ways to improve jobsite and occupational safety, and conducting employee and employer training (doc. 68-3 at p. 44). He mostly worked out of his home office (doc. 68-3 at p. 5, Cranfill dep. at 68:9–16). The majority of his work was unsupervised, and he did

not require supervisor approval before making a recommendation to a policyholder (doc. 68-6 at p. 36, Griffeth dep. at 163:4–6, 17–22). His job purpose was to minimize risk and improve employee safety, and, according to defendant Richard Balmer, the plaintiff's direct supervisor, safety consultants are "the heart of the operation" (doc. 68-4 at pp. 6–7, Balmer dep. at 154:5–13, 154:22–155:5). According to Griffeth and Witter, the safety surveys were "important" (doc. 68-6 at p. 15, Griffeth dep. at 70:15–23; doc. 68-9 at p. 4, Witter dep. at 51:4–9). Clark Frady was another safety consultant at the time the Fund hired the plaintiff (doc. 90-4 at p. 2, ¶ 3).

Danny Dilworth was the manager of the Risk Control Safety Department ("RCSD") until the end of December 2019 and conducted safety meetings with the safety consultants (*id.* at p. 3, ¶ 9). In the plaintiff's 2019 evaluation, Dilworth rated the plaintiff as "excellent" or "outstanding" in all performance categories without any comments, and the plaintiff affirmed that he agreed with this assessment (doc. 68-3 at pp. 49–50). Balmer replaced Dilworth as the RCSD manager and the plaintiff's supervisor, but he did not conduct the same weekly safety meetings as Dilworth did (doc. 90-4 at p. 4, ¶ 15). There was "a lot" of turnover within the Fund's management between December 2019 and April 2021 (doc. 68-6 at p. 13, Griffeth dep. 62:20–25). Also, Balmer announced that the safety consultants were being re-classified as salaried with a new travel program that would require the plaintiff to work more than forty hours per week (doc. 90 at p. 5).[2]

During the COVID-19 pandemic, the plaintiff claims that Griffeth and the Fund did not follow the Centers for Disease Control and Prevention ("CDC") and OSHA COVID-19-specific safety policies and protocols, despite Griffeth announcing a company COVID-19 policy on July 27, 2020 (doc. 90-3 at p. 2, ¶ 2). Frady claims that Balmer promised the safety consultants that overnight travel would not be required until "safety issues and conditions related to the pandemic were under control" and the Fund could provide them

---

[2] The plaintiff cites "ECF_68-4, pg. 21" and "ECF 68-6, pp. 68–69," but, these deposition pages were not filed. The Clerk's Office notified the plaintiff's counsel of issues with his exhibit filings (*see* doc. 91), but these issues were never corrected.

with "safe workplace conditions in the performance of their duties" (doc. 90-4 at p. 4, ¶ 18). The plaintiff testified that his pre-existing cardiac medical condition was a COVID-19 risk factor, and he was still required to travel in "dangerous and hazardous" conditions without a "proper" safety program (doc. 90-3 at p. 3, ¶¶ 6, 7, 13). The plaintiff also did not attend the Fund's 2020 Christmas party because of COVID-19 safety considerations (doc. 90-15 at p. 2).

The plaintiff alleges that Balmer ordered him to alter his Safety Survey Reports to omit any COVID-19 information and not to speak with policyholders and workers about COVID-19-related safety issues (doc. 90-3 at p. 3, ¶ 10). The plaintiff testified that prior to this order, he regularly included COVID-19-related information in his reports (*id.*). Griffeth testified that the Safety Survey Reports are not required by law, but their completion is internally considered to be a best practice (doc. 68-6 at pp. 37–38, Griffeth dep. at 164:20–165:2).

On October 19, 2020, Frady emailed Balmer to express his concerns about traveling during the pandemic because his 75-year old mother-in-law lived with him, and he did not want to risk exposing her to COVID-19 (doc. 90-14 at p. 2). After Frady sent this email, the Fund terminated his employment (doc. 90-4 at p. 4, ¶ 24).

Balmer's first evaluation of the plaintiff was in April 2021, and he rated the plaintiff's performance as mostly "satisfactory" or "excellent," with his attendance and dependability rated "outstanding" (doc. 68-3, pp. 51–52). Balmer left comments about the plaintiff's performance and identified areas for improvement, and the plaintiff noted that he disagreed with this evaluation (*id.*). The plaintiff also stated that Balmer did not fully complete the evaluation form (doc. 90-3 at p. 5, ¶ 19). The plaintiff claims that Balmer sought the plaintiff's help and assistance on multiple occasions because Balmer "was not able to proficiently perform his basic managerial duties" (*id.* at p. 2, ¶ 3). Thereafter, the plaintiff requested a Zoom meeting with Balmer and Griffeth to discuss the evaluation findings he contested and the manner in which the evaluation was completed (*id.* at p. 5, ¶ 19). This meeting occurred on April 26, 2021, and the plaintiff felt that Balmer and

5

Griffeth were "adversarial and hostile" during the meeting (*id.* at ¶ 20). The plaintiff claims that during this call he questioned safety-related workplace issues and wage and hours-worked disputes, along with other operational concerns (*id.* at ¶ 22). However, Griffeth claims that the plaintiff became upset when he realized that his evaluation would not be changed, but Griffeth hoped that the parties would be able to move on after the plaintiff had expressed how he felt (doc. 68-6 at p. 21, Griffeth dep. at 103:1–22). After this meeting, the plaintiff started recording telephone calls with other Fund employees (doc. 90-3 at p. 5, ¶ 23).

On May 6, 2021, the plaintiff had a telephone conversation with Josh Shannon, the Fund's scheduling coordinator, and the plaintiff believed it was the normal course of conduct for him to work with Shannon on scheduling issues (*id.*). Darlene Frick, the Fund's claims manager, had an office near Shannon's office and testified to overhearing this conversation (doc. 68-5 at p. 7, Frick dep. at 55:2–12). She felt that the plaintiff was being "unprofessional" and "persistent" and that Shannon wanted to get off the telephone, and she believed that Shannon was directing the plaintiff to speak with Balmer (*id.* at pp. 3, 4, 10, 17:10–18:2, 65:1–7). Frick reported this incident to Griffeth, but she did not report it as "harassment" (*id.* at p. 9, 64:14–20). Griffeth, after conversations with Shannon, Frick, and Balmer, decided to issue a written warning to the plaintiff for harassment on May 20, 2021 (doc. 68-6 at p. 25, Griffeth dep. at 112:15–25; doc. 68-3 at pp. 53–54). The next day, the plaintiff signed the warning to acknowledge receipt but noted that he disagreed with the allegations (doc. 68-3 at p. 55).

On June 4, 2021, Balmer emailed the three safety consultants, including the plaintiff, and asked them to send him all safety-related training certificates they had received before and during their employment with the Fund (doc. 68-3 at p. 57). Thereafter, Balmer and the plaintiff exchanged several emails about the plaintiff's resume and training credentials (doc. 90-3 at p. 6, ¶ 26; doc. 68-3 at pp. 58–65). On June 11, 2021, the plaintiff directed Balmer to contact a prior employer to obtain some of the information that Balmer was seeking, and the plaintiff testified that he responded in this way because he felt that

6

Balmer was not thoroughly reading the plaintiff's resume that the Fund had since it hired the plaintiff (doc. 68-3 at p. 64; doc. 90-3 at p. 6, ¶ 26).  After this email exchange, Balmer contacted Griffeth, and they issued the plaintiff a second written warning for "insubordinate behavior" on June 14, 2021 (doc. 68-3 at pp. 66–67).

On June 16, 2021, the plaintiff filed a South Carolina OSHA whistleblower complaint (doc. 68-3 at pp. 71–75).  Therein, the plaintiff claimed that the Fund issued him two written warnings with threats of discipline and termination, as well as harassing emails from management, because he "repeatedly questioned the lack of maintaining safe working environments for both [Fund] employees and the policyholder" (doc. 68-3 at pp. 73–74). The South Carolina Department of Labor, Licensing, and Regulation ("LLR") sent this complaint to the Fund with a letter dated July 30, 2021, and Griffeth claimed that he received it around August 8, 2021 (doc. 68-3 at pp. 68–69; doc. 68-6 at p. 38, Griffeth dep. at 165:16–20).  Griffeth testified that he did not know about any OSHA or LLR complaint by the plaintiff until he received this mailing in August 2021 (doc. 68-6 at p. 38, Griffeth dep. at 165:21–23).

The plaintiff requested a Zoom meeting to discuss the June 14, 2021 written warning, and this meeting was scheduled for June 18, 2021 at 2 p.m. (doc. 90-3 at p. 6, ¶ 27).  The plaintiff testified that after Griffeth and Balmer refused to permit the plaintiff to record the meeting, Griffeth became "defensive and angry" when the plaintiff said that he was recording anyway (*id.*).  The plaintiff told Griffeth that he had filed a harassment complaint with the Fund's chairman of the board of directors, defendant Herb Witter, and, thereafter, Griffeth ended the meeting (*id.*; doc. 68-6 at p. 11, Griffeth dep. at 28:20–25). The plaintiff emailed the harassment complaint to Witter at 1:59 p.m. on June 18, 2021[3] (doc. 90-25 at pp. 7–8).  The plaintiff claims that this harassment complaint contained the following language in bold font: "I am requesting that the BODs notify South Carolina OSHA

---

[3] After a thorough review of the record, it appears that no party has provided the undersigned with a copy of this harassment complaint.

Department of the allegations set forth in this complaint" (doc. 90 at p. 12).[4]  In his affidavit, the plaintiff states that he "specifically mentioned SC-OSHA in the complaint filed with Chairman Witter prior to [his] termination and asked that SC-OSHA be notified by the Fund" (doc. 90-3 at p. 6, ¶ 28).

On June 18, 2021, at 3:08 p.m., Griffeth emailed the plaintiff to notify him that the Fund had terminated his employment because Griffeth claimed that the plaintiff had "no respect for [his] supervisor's authority" (doc. 68-3 at p. 76).  The termination email also stated that the plaintiff "may make arrangements with Richard Balmer for return of [his] company vehicle and all other company property" (*id.*).  About an hour later, Balmer sent a text message to the plaintiff telling the plaintiff that Balmer and Griffeth were headed to the plaintiff's house to retrieve the Fund's "vehicle, phone, surface, photo ID, and any other company items" (doc. 68-3 at p. 77).  The plaintiff responded that he already had plans and instructed Balmer "DO NOT COME ON MY PROPERTY FOR ANY REASON WITHOUT A COURT ORDER and/or SEARCH WARRANT" because the plaintiff believed that he was "entitled to a reasonable time to secure [his] belongings and records" (*id.*).  He repeated to Balmer: "DO NOT COME ON THIS PROPERTY" and said that he would "be more than happy to release any property of [the Fund] when reasonable notice has been given" and he had "time to check and secure [his] personal items and records [he] need[s] in the defense of the allegations made against [him]" (*id.*).  The plaintiff did not mention any other persons or entities in this text message (*see id.*).

At this time, the plaintiff possessed a vehicle issued to him by the Fund, and the plaintiff claims that this vehicle was always protected and well-maintained while in his possession (doc. 90-3 at p. 6, ¶ 29).  He also normally stored personal property and documents in this vehicle, and he stated that he parked this vehicle the same way that he normally would on a Friday, with his personal van parked very close behind it (*id.*; doc. 68-3

---

[4] The plaintiff cites "ECF 68-6, pg. 30, ¶ 2" for this quotation (doc. 90 at p. 12), but, after a thorough review of the record, neither document 68-6 nor any provided documents from either party contain this quotation.

8

at pp. 78, 82, 83).  This vehicle was titled in the Fund's name, and Griffeth testified that it was "the most valuable asset that the Fund had at the time, the newest car we had that had our logo on it" (doc. 68-6 at p. 28–29, Griffeth dep. 138:22–139:3).

On June 18, 2021, Griffeth contacted the GCSO and drove from Columbia, South Carolina to Greenville County, South Carolina (*id.* at 138:2–3, 139:5–9).  Griffeth said he contacted the GCSO to help with "facilitating" and "de-escalating" the situation with the plaintiff and the vehicle (*id.* at p. 30, 140:6–9).  GCSO uniform patrol shift supervisor, Sergeant William Doyle Brewer, instructed deputies Jonathan Dale Holloway and Seth Thomas Mills to assist representatives of the Fund to retrieve the Fund's vehicle that was in the plaintiff's possession (doc. 67-2 at p. 1, ¶ 2; doc. 67-3 at p. 1, ¶ 2).  They met with Griffeth and Balmer for the first time in a church parking lot to obtain additional information from them before going to the plaintiff's house (doc. 67-2 at p. 2, ¶ 3; doc. 67-3 at p. 2, ¶ 3; doc. 68-6 at p. 29, Griffeth dep. at 139:10–14).  Deputies Holloway and Mills were present to peacefully facilitate the transfer of possession of the Fund's vehicle from the plaintiff back to the Fund (doc. 67-2 at p. 2, ¶ 6; doc. 67-3 at p. 2, ¶ 5).  During the encounter at the church and the encounters at plaintiff's home, the deputies wore activated body-worn cameras (docs. 90-9, 90-11, 90-12, 68-11, 67-4).

At the church, there were conversations among Deputy Holloway, Deputy Mills, and Griffeth with Deputy Holloway saying the plaintiff "might get a 10-81"[5] (doc. 90-9 at 5:55).  Griffeth also showed Deputy Mills the earlier text message from the plaintiff that demanded Balmer (and possibly any of the Fund defendants) obtain a court order and/or search warrant before entering the plaintiff's property (doc. 90-12 at 2:45).  After reviewing the message, Deputy Mills said the plaintiff "sounds like a real piece of work" and concluded that the Fund owned the vehicle in question (*id.* at 4:05, 5:55).

After arriving at the plaintiff's house, Deputy Holloway first approached the front door, but he walked over to the driveway when he saw the plaintiff and Lori Evans

---

[5] A code "10-81" is a disturbance or fight (doc. 90-27 at p. 2).

arrive in their vehicle (doc. 68-11 at 0:25). Upon their arrival, the plaintiff asked if the deputies were there for their dog that had escaped from the backyard, and Deputy Holloway told him that they were there for the vehicle (*id.* at 0:55). After being told the reason for their presence, the plaintiff shook Deputy Holloway's hand and introduced himself (*id.* at 1:01). Deputy Holloway told the plaintiff that they were there to prevent a breach of trust criminal situation to which the plaintiff responded, "I appreciate that." (*id.* at 2:54). The plaintiff confirmed that he did not own or rent the vehicle and only used it in the course of his prior employment with the Fund (*id.* at 3:54). Eventually, the plaintiff said that he "was not trying to be argumentative" and he would "move the vehicles" as soon as Evans came back with their dogs (*id.* at 5:46). During their interactions, the plaintiff repeatedly asked the deputies questions and proceeded to interject while the deputies were attempting to answer those questions (*see, e.g., id.* at 2:28, 2:50, 9:52). The plaintiff also issued several requests and demands to the deputies (*see, e.g.*, *id.* at 2:06 (asking Deputy Mills to stop talking while the plaintiff waited to see if the dog was found), 18:51 (demanding Deputy Holloway read a text message), 24:05 (commanding Deputy Holloway to look at the plaintiff), but he never once asked them to leave his property (doc. 68-3 at p. 37, Cranfill dep. at 267:22–25). In fact, the plaintiff appeared agitated when Deputy Holloway did eventually leave the property and challenged Deputy Holloway's suggestion that the plaintiff no longer wanted the deputies on his property (doc. 68-11 at 26:46).

After the plaintiff continued to argue with the deputies, Deputy Mills said, "Let me put it in short. You do all this stuff with your lawyer, not with us. Give the car back. Go get your stuff out of it" (doc. 90-11 at 9:45). The plaintiff eventually asked the deputies if they wanted to take him to jail to which Deputy Holloway responded, "There is nothing in the closest to that we want" (doc. 68-11 at 10:05). Deputy Mills asked the plaintiff, "Why are you prolonging this?" to which the plaintiff responded, "Because two policeman have come onto my yard not being told the truth of what's going on" (doc. 90-11 at 10:09). Deputy Mills told the plaintiff that Deputies Holloway and Mills "can leave, and [the plaintiff] can get charged with breach of trust. That's fine. We're just trying to save you from that"

(*id.* at 10:19).  Deputy Mills continued, "There's plenty of probable cause to say that you could be charged with a breach of trust" (*id.* at 10:51).[6]  Evans asked for a "few minutes" to retrieve their personal items from the vehicle, and Deputy Holloway said, "By all means, yeah, yeah" and "that's what we're hoping for" (doc. 68-11 at 11:38).  Evans then said to Deputy Mills, "Thank you for all you do" (doc. 90-11 at 12:50).

Deputy Holloway encouraged the plaintiff to take as many pictures and videos of the vehicle as he needed, and he again told the plaintiff that there were was no criminal complaint and he was there to "prevent a criminal complaint" (doc. 68-11 at 14:55).  Deputy Holloway also confirmed with the plaintiff that the plaintiff removed all of his personal items from the vehicle (*id.* at 17:08).

Deputy Mills walked off the plaintiff's property to speak with Griffeth and Balmer and told Griffeth that he was trying to help the plaintiff and Griffeth (doc. 90-11 at 14:35).  When discussing the method of vehicle retrieval, Griffeth said, "I don't even want to go on his premises. [The plaintiff] can go park it over at the pool, and I'll walk over there. . . . I don't want to back it out.  I don't want to touch his grass" (*id.* at 15:32).  Eventually, the plaintiff told Deputy Holloway, "We've been ready to return [the vehicle]," and when asked if he wanted to remove the vehicle from his property himself, he gave Griffeth express permission to drive the vehicle off his property (doc. 68-11 at 21:59, 22:27).  Griffeth only entered the plaintiff's property after the deputy told him it was safe to recover the vehicle (doc. 68-6 at p. 41, Griffeth dep. at 168:15-18).  Neither Griffeth nor Balmer entered the plaintiff's property before the deputies arrived, and they testified they had nothing to do with the plaintiff's dog escaping (doc. 68-6 at p. 42, Griffeth dep. at 169:3–14).  Also, during the

---

[6] The plaintiff completed law school, passed the South Carolina bar exam, and referred to himself as a lawyer in his conversations with the deputies (doc. 90-11 at 11:13; S.C. Judicial Branch—Attorney Search, https://www.sccourts.org/attorneys/ (enter Donald Eugene Cranfill) (shows inactive status) (last visited Jan. 23, 2025). *See Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that courts "may properly take judicial notice of matters of public record").

11

incident, Witter sent a text message to one of the Fund employees asking, "Have they pulled out the handcuffs yet?" (doc. 90-25 at p. 11).

Later that evening, the plaintiff called the GCSO and requested that Deputy Holloway return to their property to investigate how their dog escaped (*see* doc. 67-4, Holloway—BWC (Plaintiff's residence re dog)).  When the plaintiff tried to have further discussions about the Fund's vehicle, Deputy Holloway told the plaintiff and Evans that he was only there for the dog and would not be discussing the vehicle any further (*id.* at 2:07, 2:24).  Deputy Holloway was present at the property for almost twice as long as he was for the first visit, and the plaintiff asked him to look in several places on his property as part of his investigation (*see generally id.*). Before Deputy Holloway left the property, the plaintiff told him they "appreciate [Deputy Holloway] coming out" (*id.* at 54:54).

## III. APPLICABLE LAW AND ANALYSIS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 states as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not

12

rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

**B.     OSHA**

The Fund argues that it is entitled to summary judgment on the plaintiff's claims for OSHA whistleblower and retaliation because the plaintiff's exclusive remedy is through the LLR administrative process (doc. 68-1 at p. 10). In response, the plaintiff argues that *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 669 (4th Cir. 2015) permits whistleblower claims after 180 days without a final administrative decision, and outside this specific situation, the plaintiff concedes there is no private right of action under federal or South Carolina OSHA (doc. 90 at p. 19). However, the plaintiff fails to recognize that *Jones* was an action under the Sarbanes-Oxley Act (18 U.S.C. § 1514A(b)(1)(B)), and the plaintiff here has not made any claims under this Act. Accordingly, the plaintiff has no right of private action under federal OSHA because only the Secretary of the Department of Labor is authorized to investigate and prosecute meritorious claims of retaliation under OSHA. 29 U.S.C. § 660(c)(2); *Whatley v. Phillips*, No. 2:22-cv-03528-RMG-MGB, 2024 WL 2702556, at *5 (D.S.C. May 6, 2024) (finding plaintiffs could not maintain an actionable claim under OSHA for termination of their employment for reporting safety concerns because Congress intentionally declined to provide for private right of action for such circumstances), *R&R adopted by* 2024 WL 2786779 (D.S.C. May 29, 2024), *aff'd*, No. 24-1560, 2024 WL 4262790 (4th Cir. Sept. 23, 2024).

Likewise, under South Carolina OSHA, the exclusive remedy for private employees is the filing of a complaint with the LLR. While it is illegal under South Carolina

Code § 41-15-510 for an employer to discharge an employee because such employee has filed a complaint relating to state rules and regulations regarding occupational safety and health, there is an exclusive complaint process for employees who believe they have been discharged or otherwise discriminated against in violation of § 41-15-510. *See* S.C. Code Ann. § 41-15-520 (stating that employees may file a complaint with the LLR within thirty days after the violation occurs). Because of the availability of an alternative statutory remedy for employees, like the plaintiff, who believe they have been discharged or discriminated against in violation of § 41-15-510, the Fund's motion for summary judgment on the plaintiff's OSHA whistleblower and retaliation claims should be granted.

### C.    Wrongful Termination

The Fund defendants next argue that statutory remedies preempt the plaintiff's wrongful termination claim (doc. 68-1 at p. 12). The plaintiff argues in response that his termination was in retaliation for raising concerns about the Fund's refusal to require safety surveys for policyholders and the Fund's instructions to falsify his safety reports and/or downplay safety concerns (doc. 90 at p. 20). The Fund defendants reply that the plaintiff fails to cite any violation of the law in support of his public policy argument (doc. 95 at pp. 3-4).

Absent a specific contract, employment is at-will in South Carolina.[7] *Hobek v. Boeing Co.*, No. 2:16-cv-3840-RMG-MGB, 2017 WL 9250342, at *2 (D.S.C. June 8, 2017), *R&R adopted by* No. 2:16-CV-3840-RMG, 2017 WL 3085856 (D.S.C. July 20, 2017) (citing *Mathis v. Brown & Brown of S.C., Inc.*, 698 S.E.2d 773, 778 (S.C. 2010)). "'An at-will employee may be terminated at any time for any reason or for no reason, with or without cause.'" *Id.* (quoting *Mathis*, 698 S.E.2d at 778). There is a public policy exception to the at-will employment doctrine, such that an at-will employee may bring a cause of action in

---

[7] This court may exercise supplemental jurisdiction to decide the plaintiff's state law claims under 28 U.S.C. § 1367(a) because the plaintiff's "state and federal claims . . . derive from a common nucleus of operative fact.'" *See Funderburk v. S.C. Elec. & Gas Co.*, 406 F. Supp. 3d 527, 533–34 (D.S.C. 2019) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

tort for wrongful termination "where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy." *Barron v. Lab. Finders of S.C.*, 713 S.E.2d 634, 636–37 (S.C. 2011).  However, the public policy exception does not apply in cases where there is an existing statutory remedy.  *Id.* at 637.  The public policy exception "is not designed to overlap an employee's statutory or contractual rights to challenge a discharge, but rather to provide a remedy for a clear violation of public policy where no other reasonable means of redress exists." *Stiles v. Am. Gen. Life Ins. Co.*, 516 S.E.2d 449, 452 (S.C. 1999).  Thus, the plaintiff's allegations of wrongful termination for the Fund's alleged OSHA violations are subject to summary judgment because, as discussed *supra*, an exclusive administrative remedy for these allegations already exists.

   As to the remaining allegations regarding the safety surveys and the allegation to falsify the safety reports and/or downplay safety concerns, the plaintiff cites *Nolte v. Gibbs International, Inc.*, 515 S.E.2d 101 (S.C. Ct. App. 1999).  There, the employee was a certified public accountant who became suspicious of the employer's accounting practices, and when he challenged them, he was discharged.  *Id.* at 102.  The employee identified multiple state and federal laws the employer violated, including 18 U.S.C. § 371 (addressing conspiracies to commit offenses or defraud the United States) and 18 U.S.C. § 1341 (a mail fraud statute).  Here, *Nolte* is inapplicable.  The plaintiff fails to cite any law that the Fund defendants violated.  The plaintiff's allegations stem from these Safety Survey Reports, but Griffeth testified that completing the Safety Survey Reports is not required by law (doc. 68-6 at pp. 37–38, Griffeth dep. at 164:20–165:2).  The plaintiff cites no law requiring the completion of these surveys and reports and does not allege that they are required by law.

   When deciding this issue, the court "must undertake to exercise restraint and look to the language of statute, constitution, and judicial law to determine if the public policy exception should be expanded to cover a scenario where an employee internally reports violations of law made by her employer." *Trahey v. Grand Strand Reg'l Med. Ctr./HCA Healthcare, Inc. Parallon*, No. 4:22-cv-01567-RBH-TER, 2023 WL 2643833, at *3 (D.S.C.

Mar. 27, 2023).  In *Trahey*, the employee alleged she was wrongfully terminated because she internally reported alleged ethical and legal violations.  *Id.* at *2.  However, she did not allege that she was legally required to file these internal reports, nor did she cite any "statutory, constitutional, or judicial provision which favor[ed] her activity as public policy." *Id.* at *3.  Here, the plaintiff "presents these facts and the cause of action without directing this Court to any 'public policy' established in statute, Constitutional provision, or judicial decision.  This Court is in essence being asked, without any specific direction, to 'assume the prerogative' of the legislature to identify public policy, an 'amorphous inquiry' that mandates this Court to 'exercise restraint.'"  *See id.* (citing *Taghivand v. Rite Aid Corp.*, 768 S.E.2d 385, 387 (S.C. 2015)).  Thus, the plaintiff's public policy argument fails, and the Fund defendants are entitled to summary judgment on the plaintiff's wrongful termination claim.

### D.    Fraudulent Misrepresentation

The Fund defendants argue that the plaintiff's fraudulent misrepresentation claims are preempted, and even if they are not, he fails to provide evidence supporting the elements of this claim (doc. 68-1 at p. 14).  The plaintiff responds with a single sentence as follows: "Plaintiff incorporates his argument from Section 1 [OSHA exclusive remedy], above, herein as if restated in verbatim" (doc. 90 at p. 22).  In reply, the Fund defendants contend that the plaintiff has abandoned this cause of action as he has made no attempt to establish the elements of a fraudulent misrepresentation claim (doc. 95 at p. 5).  As the undersigned has previously recommended, all of the plaintiff's OSHA claims should be dismissed because there is no private right of action under federal or South Carolina OSHA. *See* discussion *supra* Part III(B).

> Additionally, as the Court of Appeals for the Fourth Circuit stated:
>
> The [plaintiff's] sparse record cites offer little guidance in our review.  *See Rodriguez-Machado v. Shinseki*, 700 F.3d 48, 49–50 (1st Cir. 2012) (per curiam) ("Essentially, [counsel] is asking us to do one of two things: accept what she says as gospel or mine the record ourselves to confirm the truth of her story—and there is no reason for us to do either. . . . [D]oing [counsel's] work for her is not an option, since that would divert

16

> precious judge-time from other litigants who could have their cases resolved thoughtfully and expeditiously because they followed the rules."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) (explaining that "[j]udges are not like pigs, hunting for truffles buried in [the record]").

*Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 250 (4th Cir. 2022). "'[I]t is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel,' and "perfunctory and undeveloped arguments . . . are waived."' *Steves and Sons, Inc. v. JELD-WEN, Inc*., 988 F.3d 690, 727 (4th Cir. 2021) (quoting *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (cleaned up)).

"The failure of a party to address an issue raised in summary judgment may be considered a waiver or abandonment of the relevant cause of action." *Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp. 2d 540, 560–61 (D.S.C. 2009)). Here, the plaintiff fails to address any of the elements of fraudulent misrepresentation. Therefore, the undersigned finds that the plaintiff has abandoned the remainder of this claim, and, as discussed *supra*, the Fund is entitled to summary judgment on the plaintiff's claim for fraudulent misrepresentation.

### E.     Defamation

The Fund defendants argue that summary judgment is appropriate on the defamation cause of action because the plaintiff has failed to identify any defamatory statements (doc. 68-1 at p. 16, doc. 95 at p. 6). In response, the plaintiff contends that unidentified statements from the Fund defendants to the GCSO[8] resulted in the GCSO referring to the plaintiff as a "10-81" and "a piece of work," as well as Witter sending a text

---

[8] In his response to the Fund defendants' motion for summary judgment, the plaintiff claims that an unidentified individual from the Fund made unidentified "statements" to GCSO Sgt. Brewer, which "branded" the plaintiff with these descriptors (doc. 90 at p. 24). In support of this claim, the plaintiff cites the following from Sgt. Brewer's deposition transcript: "I was contacted by the—who represent—who claimed to be the representative of the company that the plaintiff used to work for. And said that he has the—still had the company vehicle and would not return it" (*id.*; doc. 90-5 at pp. 5–6, Brewer dep. at 17:24–18:3). Sgt. Brewer confirmed that this was the extent of what this person told him (doc. 90-5 at p. 6, Brewer dep. at 18:3–5).

message asking, "Have they pulled out the handcuffs yet?" (doc. 90 at p. 24). The plaintiff claims that "[t]hese communications impeached the honesty, integrity, virtue and reputation of Plaintiff and exposed him to public hatred, contempt, ridicule and obloquy" and that there was "no evidence in the record or any past conduct of Plaintiff whatsoever substantiating a characteristic of such to Plaintiff" (*id.*).

Defamatory communications can take two forms: libel and slander. *Propel PEO, Inc. v. Roach*, No. 6:19-cv-3546-KFM, 2021 WL 5918623, at *15 (D.S.C. July 23, 2021). Slander is a spoken defamation, while libel is a written defamation or one accomplished by actions or conduct. *Swinton Creek Nursery v. Edisto Farm Credit*, 514 S.E.2d 126 (S.C. 1999). In South Carolina, the elements for a defamation claim are: 1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Murray v. Holnam, Inc.*, 542 S.E.2d 743, 748 (S.C. Ct. App. 2001). The court makes an initial determination of whether the statement is susceptible of having a defamatory meaning. *White v. Wilkerson*, 493 S.E.2d 345, 347 (S.C.1997). "[T]he law in South Carolina allows the context of the words themselves and the circumstances under which the words are spoken to be considered in determining whether there is a defamatory meaning and whether it is actionable . . . ." *Goodwin v. Kennedy*, 552 S.E.2d 319, 324 n.4 (S.C. Ct. App. 2001).

Also, a state common law defamation claim must comport with the First Amendment. *See Snyder v. Phelps*, 580 F.3d 206, 217 (4th Cir. 2009) ("It is well established that tort liability under state law, even in the context of litigation between private parties, is circumscribed by the First Amendment."). The First Amendment imposes limitations on defamation suits based on the subject of the alleged defamation, as well as the type of speech at issue. *Id.* The Fourth Circuit explained that, even considering speech "targeting private figures," as opposed to public figures or public officials:

18

> [T]he [Supreme] Court has recognized that there are constitutional limits on the type of speech to which state tort liability may attach . . . . Thus, although there is no categorical constitutional defense for statements of "opinion," the First Amendment will fully protect "statements that cannot reasonably '[be] interpreted as stating actual facts' about an individual."

*Id.* at 218 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). The Court further explained there are two subcategories of speech that cannot reasonably be interpreted as stating actual facts about an individual and are therefore constitutionally protected: "First, the First Amendment serves to protect statements on matters of public concern that fail to contain a 'provably false factual connotation,'" and "Second, rhetorical statements employing 'loose, figurative, or hyperbolic language' are entitled to First Amendment protection to ensure that 'public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation." *Id.* at 219–20 (citing *Milkovich*, 497 U.S. at 20–21). In determining whether a statement could be interpreted as stating actual facts, courts both "'assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message' and 'emphasize the verifiability of the statement, because a statement not subject to objective verification is not likely to assert actual facts.'" *Kent v. Hennelly*, No. 9:19-cv-1383-DCN, 2019 WL 5896442, at *8 (D.S.C. Nov. 12, 2019) (quoting *Snyder*, 580 F.3d at 219).

Here, the plaintiff's defamation claim against the Fund defendants cannot survive summary judgment. The plaintiff cannot identify any statements from the Fund defendants that labeled the plaintiff as a "possible 10-81" or a "piece of work" as the evidence shows that these statements were made by GCSO Deputies Holloway and Mills, respectively. While the plaintiff alleged nebulous statements from unidentified individuals employed by the Fund caused the deputies to make these statements about the plaintiff, this is not sufficient to withstand a summary judgment motion. Further, the text message between the two Fund employees asking, "Have they pulled out the handcuffs yet?" was simply a question between two employees of the same company "that cannot reasonably

19

[be] interpreted as stating actual facts" about the plaintiff's conduct or character. Accordingly, the undersigned recommends that the Fund defendants be granted summary judgment on the plaintiff's defamation claim.

## F.    *Intentional Infliction of Emotional Distress*

At his deposition, the plaintiff testified that the Fund calling law enforcement to his home inflicted intentional emotional distress on him (doc. 68-3 at pp. 27-28, Cranfill dep. at 208-09). The Fund defendants seek summary judgment on the plaintiff's IIED claim because they allege that their reaching out to the GCSO for return of their vehicle is insufficient to support such a claim (doc. 68-1 at p. 18). The plaintiff responds by incorporating the "facts" and arguments asserted later in support of his Section 1983 claim and concluding that the plaintiff was distressed "beyond what a reasonable man could be expected to endure and is outrageous conduct that atrocious [sic.], and utterly intolerable in a civilized community" (doc. 90 at p. 25).

South Carolina law imposes a high standard for establishing an IIED claim. *Nolan v. U.S. Bank Nat'l Ass'n as Tr. for C-Bass Mortg. Loan Asset-Backed Certificates, 2006-RP2*, No. 2:23-CV-1443-RMG, 2024 WL 621082, at *1 (D.S.C. Feb. 14, 2024). To prove an IIED claim, a plaintiff must establish four elements: (1) that the defendant recklessly or intentionally inflicted severe emotional distress or knew that distress would probably result from the conduct; (2) that the conduct was so extreme and outrageous that it exceeded all possible bounds of decency and was atrocious and utterly intolerable in a civilized community; (3) that the actions caused emotional distress; and (4) that the distress suffered was so severe that no reasonable person could be expected to endure it. *Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 70–71 (S.C. 2007) (citing *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981)). As to the final two elements, "[t]o permit a plaintiff to legitimately state a cause of action by simply alleging, 'I suffered emotional distress' would be irreconcilable with this Court's development of the law in this area." *Id.* at 72. The court plays a significant gatekeeping role to prevent claims for IIED from becoming a remedy for "wounded feelings rather than reprehensible conduct." *Wall v. Enter. Leasing Co.—Se.,*

*LLC.*, No. 3:18-CV-1225-TLW-SVH, 2019 WL 4935631, at *2 (D.S.C. Jan. 30, 2019) (citation and internal quotation marks omitted), *R&R adopted by* 2019 WL 4931316 (D.S.C. Oct. 4, 2019). The court must look for something "more" to show "severe" emotional distress. *Hansson*, 650 S.E.2d at 72 (citing *Rhodes v. Sec. Fin. Corp. of Landrum*, 233 S.E.2d 105, 106 (S.C. 1977)).

Here, the plaintiff has produced no evidence that he suffered severe emotional distress. There is nothing provided in his response to the motion for summary judgment beyond his bald assertions of distress. This is nothing more than stating "I suffered emotional distress." *See Hansson*, 650 S.E.2d at 72. While the plaintiff testified that the GCSO's presence on his property caused him to lose sleep because it humiliated and embarrassed him (doc. 68-3 at pp. 28, 30, Cranfill dep. at 209:17–23; 214:2–5), lost sleep and "wounded feelings" are insufficient to support an IIED claim. *See Wall*, 2019 WL 4935631, at *2; *see also Hansson*, 650 S.E.2d at 72 (finding that the plaintiff's testimony of lost sleep and teeth grinding is insufficient to meet the "severe" standard for an IIED claim). Without more, this falls woefully short of the "severe" standard required to prove an IIED claim. Therefore, the Fund defendants should be granted summary judgment on the plaintiff's IIED claim.

### G.    Abuse of Process

The Fund defendants argue that they are entitled to summary judgment on the plaintiff's abuse of process claim because there was no process, and even if there was process, the plaintiff has not produced sufficient evidence to satisfy the elements of this claim (doc. 68-1 at pp. 20–21). In response, the plaintiff argues that the Fund defendants' use of the GCSO "compel[led]" the plaintiff to return the Fund's vehicle, and this was a perversion of process (doc. 90 at p. 26).

"'The essential elements of an abuse of process claim are an ulterior purpose and a willful act in the use of the process not proper in the conduct of the proceeding.'" *Argoe v. Three Rivers Behavioral Ctr. & Psychiatric Solutions*, 697 S.E.2d 551, 556 (S.C. 2010) (quoting *Hainer v. Am. Med. Int'l, Inc.*, 492 S.E.2d 103, 107 (S.C. 1997)). "The abuse

of process tort provides a remedy for one damaged by another's perversion of a legal procedure for a purpose not intended by the procedure." *Id.* (citing *Food Lion, Inc. v. United Food & Com. Workers Int'l Union*, 567 S.E.2d 251, 253 (S.C. Ct. App. 2002)). "Some definite act or threat not authorized by the process or aimed at an object not legitimate in the use of the process is required." *Hainer*, 492 S.E.2d at 107. However, a defendant will not be held liable for an abuse of process where it has "done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* The essence of the tort of abuse of process centers on events occurring outside the process, namely:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

*Swicegood v. Lott*, 665 S.E.2d 211, 214 (S.C. Ct. App. 2008) (quoting *Huggins v. Winn–Dixie Greenville, Inc.*, 153 S.E.2d 693, 694 (S.C. 1967)).

Here, even assuming that what happened was "process," the record contains no such coercion, collateral advantage, or extortion. The deputies told the plaintiff that they were present to keep the peace and to avoid the Fund filing a criminal complaint against the plaintiff but reiterated they had no intention of arresting him presently (doc. 68-11 at 2:54, 10:05, 21:30, 22:31). Contrary to the plaintiff's argument, the GCSO did not "compel" the plaintiff to return the vehicle. At the outset, the plaintiff willingly told the deputies that he would move the vehicles once Evans returned with his loose dog (*id.* at 5:46), and he later told the deputies that he was ready to return the vehicle and voluntarily returned possession of the vehicle to the Fund (*id.* at 21:59, 22:27). Later, Deputy Mills told the plaintiff that the deputies could leave but warned the plaintiff that they could return if the Fund defendants pursued a breach of trust complaint (doc. 90-11 at 10:19). The GCSO deputies acting as peacekeepers to facilitate a transfer of the vehicle from the plaintiff to the Fund to avoid the criminal process was not "a perversion of the civil process" as argued

by the plaintiff (see doc. 90 at p. 26). The plaintiff provides no evidence that the Fund defendants sought the assistance of the GCSO with bad intentions or motive. Thus, the Fund defendants should be granted summary judgment on the plaintiff's abuse of process claim.

### H.    Trespass

The plaintiff claims that the Fund defendants trespassed on his property when they came to take the vehicle (doc. 1-1 at pp. 21-22). The Fund defendants argue that the plaintiff's trespass claim fails because the plaintiff changed his mind and gave Griffeth permission to enter the plaintiff's property to retrieve the vehicle (doc. 68-1 at p. 23). The plaintiff responds with arguments that Griffeth entered the plaintiff's property to take the vehicle without the plaintiff's permission and no privilege existed that permitted Griffeth to enter the plaintiff's property (doc. 90 at pp. 27–28).

"Trespass is any intentional invasion of the plaintiff's interest in the exclusive possession of his property." *Hedgepath v. Am. Tel. & Tel. Co.*, 559 S.E.2d 327, 337 (S.C. Ct. App. 2001). "To state a claim for trespass, a plaintiff must allege facts showing three elements—that the defendant took 'an affirmative act,' that 'the invasion of the land [was] intentional,' and that 'the harm caused [was] the direct result of that invasion.'" *Johnston v. Anderson Reg'l Landfill, LLC*, 725 F. Supp. 3d 527, 538 (D.S.C. 2024) (quoting *Snow v. City of Columbia*, 409 S.E.2d 797, 802 (S.C. Ct. App. 1991)).

Here, the plaintiff's claim for trespass fails because none of the Fund defendants "invaded" the plaintiff's property. The evidence before the court is undisputed that the plaintiff gave Griffeth express permission to enter the plaintiff's property to retrieve the vehicle after Deputy Holloway asked the plaintiff if he wanted to drive the vehicle off his property himself or have Griffeth enter and drive it away (doc. 68-11 at 22:27). There is no evidence that any of the Fund defendants entered the plaintiff's property before the plaintiff gave Griffeth permission to enter and drive the vehicle away. Accordingly, the undersigned recommends that summary judgment be granted in favor of the Fund defendants on the plaintiff's trespass claim.

23

## I.    Fair Labor Standards Act

The FLSA requires that certain employees be paid at time and a half for work over forty hours per week. 29 U.S.C. § 207(a)(1).  Persons "employed in a bona fide executive, administrative, or professional capacity" ("the administrative exemption") are exempt from this overtime requirement.  *Id.* § 213(a)(1).  The Secretary of Labor has adopted a three-part test for determining whether an employee is subject to the administrative exemption: (1) the employee must be compensated at a salary rate of not less than $684 per week; (2) the employee's primary duty must consist of "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's primary duty must "include[ ] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200 (2019).[9]

It is undisputed that the plaintiff was paid at least $684 per week (doc. 68-10) and performed non-manual office work (*see* doc. 68-1 at p. 25; doc. 90 at pp. 28–31). However, the plaintiff contends that he was not exempt because his "primary duty was not 'directly related to the management or general business operations of the Fund or the Fund's customers" (doc. 90 at p. 29 (quoting 29 C.F.R. § 541.200(a))).

An employee meets the "directly related" test when he "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 C.F.R. § 541.201(a).  "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as safety and health; . . . legal and regulatory compliance; and similar activities."  *Id.* § 541.201(b).  "An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers.  Thus, for example, employees acting as

---

[9] This was the version in effect during the relevant time of the plaintiff's employment with the Fund.

advisers or consultants to their employer's clients or customers . . . may be exempt. *Id.* C.F.R. § 541.201(c).

An employees's FLSA's overtime requirement exemption status is a mixed question of law and fact. *Williams v. Genex Servs.*, LLC, 809 F.3d 103, 109 (4th Cir. 2015). "'The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Id.* (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). It is the employer's burden to prove by clear and convincing evidence that the employee qualifies for an exemption. *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir.1993). When making this determination, exemptions should be given a "fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018) (internal quotations omitted).

Here, the parties agree that the plaintiff's general job duties included the following: conducting risk control surveys at members' jobsites, identifying hazards and proposing corrective actions, preparing verbal and written reports for use by members and Fund's management team, assisting in underwriting inspections to determine a candidate's suitability for participation in the Fund, assisting in post-accident investigations, seeking ways to improve jobsite and occupational safety, and conducting employee and employer training (doc. 68-3 at p. 44; doc. 68-1 at pp. 25–26; doc. 90 at p. 30). These are "functional areas" "such as . . . safety and health" for the Fund's customers on which the plaintiff was a consultant who provided recommendations on how they can be improved. *See* 29 C.F.R. § 541.201(b)–(c). Further, these safety reports were important to the business operations and prepared and communicated to the plaintiff with little to no supervision (doc. 68-6 at pp. 15, 36, Griffeth dep. at 70:15–23, 163:4–6, 17–22; doc. 68-9 at p. 4, Witter dep. at 51:4–9). Accordingly, they required "the exercise of discretion and independent judgment with respect to matters of significance." Thus, the undersigned finds that the plaintiff was exempt from the FLSA overtime requirements, and the Fund defendants are entitled to summary judgment on this FLSA claim.

### J.     Civil Conspiracy

The Fund defendants argue that the plaintiff has failed to meet the elements of his civil conspiracy claim (doc. 68-1 at p. 28). In response, the plaintiff argues that there was a conspiracy between the GCSO and the Fund defendants to compel the plaintiff to turn over the Fund's vehicle and incorporates his previous arguments regarding abuse of process and trespass (doc. 90 at p. 31).

A plaintiff asserting a civil conspiracy claim must establish: "(1) the combination or agreement of two or more persons; (2) to commit an unlawful act or a lawful act by unlawful means; (3) together with the commission of an overt act in furtherance of the agreement; and (4) damages proximately resulting to the plaintiff." *Paradis v. Charleston Cnty. Sch. Dist.*, 861 S.E.2d 774, 780 (2021) (citing *Charles v. Texas Co.*, 18 S.E.2d 719, 727 (S.C. 1942)). "The gravamen of the tort of civil conspiracy is the damage resulting to plaintiff from an overt act done pursuant to a common design." *Cricket Cove Ventures, LLC v. Gilliand*, 701 S.E.2d 39, 46 (S.C. Ct. App. 2010). A civil conspiracy claim must be supported by facts independent of the other causes of action in the complaint; a plaintiff may not simply incorporate allegations that support other causes of action to sustain a cause of action for civil conspiracy. *Id.* (citing *Todd v. S.C. Farm Bureau Mut. Ins. Co.*, 278 S.E.2d 607, 611 (S.C. 1981)).

Here, the plaintiff's claim fails because he simply incorporates the facts from other causes of action and because he has failed to establish an agreement "to commit an unlawful act or a lawful act by unlawful means." As discussed previously, the plaintiff has failed to produce sufficient evidence of abuse of process because the evidence showed there was no coercion and the plaintiff voluntarily returned the vehicle (*see supra* Part III(G)). Further, there was no "institution of criminal process" against the plaintiff (*see id.*). Moreover, there was no trespass because the plaintiff gave Griffeth express permission to enter the plaintiff's property to retrieve the vehicle (*see supra* Part III(G)). The evidence presented shows that the GCSO lawfully attempted to facilitate the peaceful transfer of possession of the vehicle to the Fund defendants. Based upon the foregoing, the

26

undersigned recommends that summary judgment be granted on the plaintiff's civil conspiracy claim.

### K.     Section 1983 Claim

The Fund defendants seek summary judgment on the plaintiff's Section 1983 claim because they are not state actors (doc. 68-1 at p. 31).  The plaintiff responds that Section 1983 is implicated because the GCSO committed "an unconstitutional act" in the course of enforcing the Fund's rights (doc. 90 at p. 33).  The plaintiff claims that the GCSO defendants and the Fund defendants worked together to violate his Fourth Amendment rights by entering his property and seizing the vehicle and to violate his Fourteenth Amendment rights by falsely imprisoning him without due process (*id.* at pp. 35–37).

To implicate Section 1983, conduct must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982) (observing that § 1983's "under color" of law requirement is equivalent to the Fourteenth Amendment's "state action" requirement (citing *United States v. Price*, 383 U.S. 787, 794 n.7 (1966))).  Under the "joint participation theory," a private party may be found to have acted under color of law by "acting in concert with a state actor." *Int'l Ass'n of Machinists & Aerospace Workers v. Haley*, 832 F. Supp. 2d 612, 625 (D.S.C. 2011) (citing *DeBauche v. Trani*, 191 F.3d 499, 506–07 (4th Cir. 1999)).  The person charged must either be a state actor or have a sufficiently close relationship or nexus with state actors such that a court would conclude that the non-state actor is engaged in the state's actions.  *See, e.g.*, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 620 (1991) ("Although the conduct of private parties lies beyond the Constitution's scope in most instances, governmental authority may dominate an activity to such an extent that its participants must be deemed to act with the authority of the government and, as a result, be subject to constitutional constraints").  The establishment of this close relationship or nexus "depends on whether the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed

to be that of the State.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

"As the Fourth Circuit has observed, the Supreme Court has attempted to limit the joint participation theory and has explained that joint action or participation requires more than simply 'private and public joint activity.'" *Haley*, 832 F. Supp. 2d at 625 (citing *DeBauche*, 191 F.3d at 506–07). Private action will generally not be deemed "state action" unless the state has so dominated such action that it has been converted into state action. *DeBauche*, 191 F.3d at 507. "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment." *Blum*, 457 U.S. at 1004–05. Applying the principles explained and refined by the Supreme Court, the Fourth Circuit recognizes four exclusive circumstances under which a private party can be deemed to be a state actor:

> (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.

*DeBauche*, 191 F.3d at 507 (quoting *Andrews v. Fed. Home Loan Bank of Atlanta*, 998 F.2d 214, 217 (4th Cir. 1993)). The plaintiff argues only that the fourth circumstance—whether the state has committed an unconstitutional act in the course of enforcing a right of a private citizen—applies to this matter (doc. 90 at p. 33).

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "The Fourth Amendment protects homes and the 'land immediately surrounding and associated' with homes, known as curtilage, from unreasonable government intrusions." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 192 (4th Cir. 2015) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)). Moreover, "[i]t is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to

28

a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and citations omitted). One such exception is "the so-called knock-and-talk exception to the Fourth Amendment's warrant requirement," under which, "'a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Covey*, 777 F.3d at 192 (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)). In the typical situation, an officer has an "'implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.'" *Id.* When circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property, an officer may bypass the front door or another entry point typically used by visitors. *Id.* (citing *Pena v. Porter*, 316 F. App'x 303, 313 (4th Cir. 2009)).

Here, none of the defendants violated the plaintiff's Fourth Amendment rights. The plaintiff claims that he had a legal right to possession of the Fund's vehicle under a bailment theory and had no legal obligation to return the vehicle when the GCSO deputies came to his home on June 18, 2021 (doc. 90 at pp. 33–34). Even accepting as true the plaintiff's argument that his possession of the vehicle was a bailment and that he had no legal obligation to return the vehicle that day, the plaintiff voluntarily relinquished all possessory interest in the vehicle (*see supra* Part III(G)). None of the defendants compelled him to return the vehicle or seized the vehicle before the plaintiff gave express permission for them to do so. While the plaintiff argues that Deputy Mills compelled him to return the vehicle (doc. 90-11 at 9:45), Deputy Mills stated in the same conversation mere seconds later that the GCSO deputies could leave the property and come back later if the Fund defendants file a criminal complaint against the plaintiff (*see* doc. 90-11 at 10:19).

Also, Deputies Mills and Holloway were entitled to enter the plaintiff's property and approach the front door until they saw the plaintiff in his driveway and pivoted to meet him there. The plaintiff, who is legally trained and refers to himself as a lawyer, never told anyone from the GCSO that they were not permitted on his property, and he never asked either Deputy Mills or Deputy Holloway to leave his property. To the contrary, later on the

29

same day, the plaintiff requested that Deputy Holloway return to the property, and upon his return, the plaintiff attempted to further discuss the vehicle issue (*see* doc. 67-4, Holloway—BWC (Plaintiff's residence re dog) at 2:07, 2:24). While the plaintiff claims that a text message he had sent to Balmer earlier in the day was a "clear constitutional warning" that applied to the GCSO deputies (doc. 90 at p. 36), a reading of the text message shows that the warning specifically applied to Balmer (and possibly the other Fund defendants) (*see* doc. 68-3 at p. 77). There is no command to the GCSO or anyone other than the actual recipient of the message. Accordingly, this "warning" cannot reasonably apply to parties to whom it was not addressed or referenced, and the plaintiff has failed to present sufficient evidence to support his Section 1983 Fourth Amendment claim.

Although the plaintiff claims a Fourteenth Amendment violation for false imprisonment (doc. 90 at p. 36), Section 1983 actions premised on malicious prosecution, false arrest, and/or false imprisonment are analyzed as actions claiming unreasonable seizures in violation of the Fourth Amendment. *See, e.g.*, *Brown v. Gilmore*, 278 F.3d 362, 367–68 (4th Cir. 2002) (recognizing that a plaintiff alleging a Section 1983 false arrest claim needs to show that the officer decided to arrest him without probable cause to establish an unreasonable seizure under the Fourth Amendment); *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (stating claims of false arrest and false imprisonment "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment").

The plaintiff has presented no evidence that any of the defendants seized him in violation of the Fourth Amendment. In his response to the Fund defendants' motion for summary judgment, the plaintiff provides no citations to any record evidence showing an arrest and baldly concludes in his response to the Fund defendants' motion for summary judgment that "the words and conduct of the GCSO were such to intentionally induce a reasonable apprehension of force; accordingly, and [sic.] the means of coercion were at hand" (doc. 90 at p. 37). To the contrary, the unrebutted evidence presented to the court shows that Deputies Mills and Holloway had no intention of arresting the plaintiff and expressed that to the plaintiff multiple times (*see* doc. 68-11 at 2:54, 10:05, 21:30, 22:31).

30

Moreover, at no point did the deputies restrain the plaintiff or even attempt to restrict his movements in any manner. Thus, there was no "seizure of the person in violation of the Fourth Amendment," and summary judgment should be granted on the plaintiff's Section 1983 claims for alleged Fourth and Fourteenth Amendment violations.

**L.    Breach of Contract**

The Fund defendants argue that summary judgment should be granted on the plaintiff's breach of contract cause of action because the employee handbook has a valid disclaimer and thus did not create a contract of employment under South Carolina law (doc. 68-1 at p. 34 (citing S.C. Code. Ann. § 41-1-110)) . In response, the plaintiff argues that this purported disclaimer fails to comply with South Carolina Code Annotated § 41-1-110 as it is not "conspicuous" (doc. 90 at p. 38). However, other than this one sentence, the plaintiff provides no further explanation of his argument regarding the disclaimer (*see id.*).

Under South Carolina law, an employee handbook forms a contract when: (1) the handbook provisions and procedures in question apply to the employee; (2) the handbook sets out procedures binding on the employer; and (3) the handbook does not contain a conspicuous and appropriate disclaimer. *Grant v. Mount Vernon Mills, Inc.*, 634 S.E.2d 15, 20 (S.C. Ct. App. 2006). Regarding the disclaimer, South Carolina Code Annotated § 41-1-110 provides as follows:

> It is the public policy of this State that a handbook, personnel manual, policy, procedure, or other document issued by an employer or its agent after June 30, 2004, shall not create an express or implied contract of employment if it is conspicuously disclaimed. For purposes of this section, a disclaimer in a handbook or personnel manual must be in underlined capital letters on the first page of the document and signed by the employee. For all other documents referenced in this section, the disclaimer must be in underlined capital letters on the first page of the document. Whether or not a disclaimer is conspicuous is a question of law.

S.C. Code Ann. § 41-1-110.

The defendant produced a copy of its employee handbook  disclaimer (doc. 68-3 at p. 47), and the plaintiff does not dispute that this handbook was applicable to him (*see* doc. 90 at p. 38). The disclaimer provides as follows:

31

**DISCLAIMER**

ALL EMPLOYEES OF THE SOUTH CAROLINA HOME
BUILDERS SELF INSURERS FUND (SCHBSIF) ARE
EMPLOYED AT-WILL AND MAY QUIT OR BE TERMINATED
AT ANY TIME AND FOR ANY REASON. NOTHING IN ANY
OF SCHBSIF'S RULES, POLICIES, HANDBOOKS,
PROCEDURES OR OTHER DOCUMENTS RELATING TO
EMPLOYMENT CREATES ANY EXPRESS OR
IMPLIED CONTRACT OF EMPLOYMENT. NO PAST
PRACTICES OR PROCEDURES, WHETHER ORAL OR
WRITTEN, FORM ANY EXPRESS OR IMPLIED AGREEMENT
TO CONTINUE SUCH PRACTICES OR PROCEDURES. NO
PROMISES OR ASSURANCES, WHETHER WRITTEN OR
ORAL, WHICH ARE CONTRARY TO OR INCONSISTENT
WITH THE LIMITATIONS SET FORTH IN THIS PARAGRAPH
CREATE ANY CONTRACT OF EMPLOYMENT UNLESS: 1)
THE TERMS ARE PUT IN WRITING, 2) THE DOCUMENT IS
LABELED "CONTRACT," 3) THE DOCUMENT STATES THE
DURATION OF EMPLOYMENT, AND 4) THE DOCUMENT IS
SIGNED BY THE CHAIR OF THE SCHBSIF BOARD OF
DIRECTORS.

I acknowledge receipt of the SCHBSIF Employee Handbook
AND UNDERSTAND THAT IT IS NOT A CONTRACT OF
EMPLOYMENT.

(doc. 68-3 at p. 47). This page appears to have been signed by the plaintiff on November

13, 2017 (*id.*), and the plaintiff does not challenge the authenticity of this signature (*see*

doc. 90 at p. 38).

The undersigned finds that the Fund's handbook contains a conspicuous

disclaimer that satisfies the requirements of South Carolina Code Annotated § 41-1-110.

The disclaimer is in underlined and capital letters, and the plaintiff signed it. Moreover, the

disclaimer is on the page labeled as page one. Even if there was a cover page, other

courts have recognized that the first substantive page after a cover page can satisfy South

Carolina's statutory requirements for a conspicuous disclaimer. *See, e.g.*, *Daniels v.*

*Harsco Corp.*, No. 3:22-cv-2752-JFA-KDW, 2023 WL 2815337, at *9 n.8 (D.S.C. Feb. 9,

2023) ("The undersigned . . . agrees that the 'first page' statutory requirement may at times

be satisfied by having a compliant conspicuous disclaimer on the 'first page after the cover

page' of the handbook."), *R&R adopted by* 2023 WL 2569438 (D.S.C. Mar. 20, 2023);

*Bishop v. City of Columbia*, 738 S.E.2d 255, 260 (S.C. Ct. App. 2013) (finding an employee

handbook was not a contract when there was a conspicuous disclaimer on the first page after the cover page). Accordingly, the Fund defendants are entitled to summary judgment on the plaintiff's breach of contract claim.

## IV. CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the district court grant the Fund defendants' motion for summary judgment (doc. 68).

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

January 24, 2024
Greenville, South Carolina

**The attention of the parties is directed to the important notice on the next page.**

33

### *Notice of Right to File Objections to Report and Recommendation*

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
250 East North Street, Suite 2300
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).